**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FRANK DONOFRIO, on behalf of himself individually and on behalf of those similarly situated,<br>Plaintiff,<br><br>v.<br><br>IKEA US RETAIL, LLC,<br>Defendant. | CIVIL ACTION NO. 18-599-AB |
| WILLIAM V. ANTONELLI, JR., on behalf of himself individually and on behalf of those similarly situated,<br>Plaintiff,<br><br>v.<br><br>IKEA HOLDING US, INC., IKEA US RETAIL, LLC, AND IKEA NORTH AMERICA SERVICES, LLC<br>Defendants. | CIVIL ACTION NO. 19-1286-AB |
| BRANDON PAINE, on behalf of himself individually and on behalf of those similarly situated,<br>Plaintiff,<br><br>v.<br><br>IKEA HOLDING US, INC., IKEA US RETAIL, LLC, and IKEA NORTH AMERICA SERVICES, LLC,<br>Defendants. | CIVIL ACTION NO.19-723-AB |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' ESTIMATED BREAKDOWN OF ATTORNEY'S FEES**

## INTRODUCTION

Plaintiffs' unauthorized fifth[1] bite at the "$64,000" apple[2] yet again fails to show that the deletion of a few mailboxes and not having the supplemental production sooner prejudiced them at all, let alone by how much. Their failure to show a sanctionable discovery violation moots their belatedly filed "break down" of fees. (*See* ECF 372-1, 371:1.) But, even if they had shown IKEA violated a court order (which it did not), Plaintiffs' latest effort to answer the Court's $64,000 question – citing no case law and little evidence – only reinforces they were not prejudiced because discovery was past the point of diminishing returns before the supplemental production. (*See* ECF 372-1:63 (¶ 1.2).) As is shown is detail below, the documents they focus attention on reflect nothing more than the same age-related diversity initiatives that were discovered prior to the supplemental production in December 2023, indeed even before conditional certification in 2018. Their serial failed attempts to show prejudice demonstrate that this motion for sanctions has never been about discovery problems. The problem is not that they have suddenly found new and previously hidden proof of "company-wide" diversity initiatives, as they disingenuously assert. (ECF 371:5.) The problem is that proving company-wide diversity initiatives in the abstract fails to establish that any specific decision maker made any specific challenged promotion decision based on age, let alone that all did in every such decision. Therefore, Plaintiffs' counsel expects the cases will be decertified, and they will lose their improvident investment, absent the salvation of discovery sanctions that are case-dispositive or coffer filling. This Hail Mary pass, however, does not connect because the documents they purport to be surprised by are more of the same thing they have had all along.

[1] *See* ECF 372:30 (¶ 8.1).

[2] Transcript Jan. 29, 2024, 60:2, 63:8-15 (Assuming the Court finds IKEA was "naughty", then "how were you affected by it" because "this is the $64,000 question", and "[s]o far, I haven't heard it.").

No event they identify would have been avoided or lessened by the possession of the cumulative supplemental production. Therefore, their motion must be denied even if: (a) the Court had ordered the supplemental production at all (which it did not); (b) the Court had ordered it to be completed sooner (which it did not); and (c) Plaintiffs had not caused their own inconvenience, if any, by *knowingly* plunging ahead with depositions and allowing discovery to close without the benefit of the supplemental production (as they did).

## ARGUMENT

### 1.

### Cumulativeness
### (ECF 371:5 (¶¶ 1-5).)

Contrary to Plaintiffs' assertion, earlier possession of the cumulative documents would not have saved Plaintiffs' counsels' investment in this case, in whole or in part. Their "break down" focuses exclusively on an email (IKEA-101714-14) and an attachment (IKEA-101724-63) (both attached as **Exhibit 1**) that: (a) reflect the same information they have had all along; and (b) do not save the cases from decertification.

The cover email (IKEA-101714) reveals nothing more than the scheduling of a "D&I kickoff meeting." The existence of such meetings is not new information to Plaintiffs. Numerous high level HR witnesses testified about the diversity group and meetings. Sari Brody's title after 2012 was "D&I Global" and she testified about D&I meetings with "global diversity ambassadors" who would then "come back" to their countries. (Brody Dep., 26:20-22, 52:15-22, 54:6-18 (attached as **Exhibit 2**).) Kirstie Olafsson testified about an "HR management team" and "committee" having "meetings" about "diversity and inclusion goals." (Olafsson Dep., 73:1-11 (attached as **Exhibit 3**).) Nabeela Ixtabalan testified about D&I "conference call[s]" with other HR leaders and coordinating with "global" D&I leadership. (Ixtabalan Dep., 16:11-17:15, 61:1-

62:5 (attached as **Exhibit 4**).) Plaintiffs had, and used as exhibits, many documents reflecting such meetings. (*See*, *e.g.*, Olafsson Dep., 90:16-91:5; 100:9-101:20; Exs. P-110 and P-112 ("Meeting Minutes" of "Strategic Human Resources US" reflecting age-related diversity goals) (attached as **Exhibit 5**); Ixtabalan Dep., 176:14-177:2 ("referencing the conference") (attached as **Exhibit 6**) and Ex. P-157 (DeChamps email referring to a "Diversity and Inclusion meeting in July") (attached as **Exhibit 7**). Long before the December 2023 supplemental production, Plaintiffs were aware that high level HR professionals at IKEA held meetings on diversity and inclusion.

The attachment (IKEA-101724-63) is a slide deck titled "IKEA US Diversity & Inclusion" that compares 2014 to 2015 across multiple dimensions of diversity, including gender, race, ethnicity, and age. It charts the percentages of co-workers by age and role and notes that millennials were underrepresented in management roles. It concludes that "[w]e need to spot and prioritize potential and move them fast through our development pipeline" so as to "increase the number of coworkers under 34 in exempt management:"

| **Total Age** | <25 | | 25-34 | | 35-44 | | 45-54 | | 55-64 | | >65 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9.01.2014 | 9.01.15 | 9.01.2014 | 9.01.15 | 9.01.2014 | 9.01.15 | 9.01.2014 | 9.01.15 | 9.01.2014 | 9.01.15 | 9.01.2014 | 9.01.15 |
| Hourly Co-workers (includes Salaried Non-Exempt) | 27.9% | 29.0% | 29.0% | 30.8% | 15.8% | 13.8% | 14.2% | 13.2% | 10.0% | 9.7% | 3.1% | 3.5% |
| Management Support | 6.2% | 5.8% | 45.2% | 46.1% | 25.8% | 26.9% | 16.2% | 14.8% | 5.7% | 5.6% | 0.9% | 0.8% |
| Management (exempt) | 0.7% | 0.4% | 26.6% | 28.3% | 37.1% | 39.6% | 26.2% | 23.6% | 8.7% | 7.8% | 0.7% | 0.4% |
| Grand Total | 22.3% | 23.6% | 29.8% | 31.9% | 19.7% | 18.0% | 16.1% | 14.5% | 9.5% | 9.1% | 2.6% | 2.9% |

**Key Takeaway:** Millennials continue to dominate our coworker base accounting for 60% of coworkers but only 30% of exempt managers. The average tenure of exempt managers is 6-10 years with IKEA. We need to spot and prioritize potential and move them faster through our development pipeline, increase the number of coworkers under 34 in exempt management

**59.8%** of our workforce is <34 up 2.9% from FY14
**51.9% of** our TL's & Mgmt. Support are<34
**28.7%** of our Exempt Mgrs. are <34

This is more of the same thing Plaintiff already knew from a multitude of documents and testimony, as the following examples illustrate.

Many charts like this were produced before the supplemental production in December 2023. For example, IKEA-048649 contains similar charts for 2014:

| Age | <25 | | 25-34 | | 35-44 | | 45-54 | | 55-64 | | >65 | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # |
| **Hourly Co-workers** *(includes Salaried Non-Exempt)* | 2,991 | **27.9%** | 3,101 | **29.0%** | 1,697 | **15.8%** | 1,518 | **14.2%** | 1,074 | **10.0%** | 330 | **3.1%** | **10,711** |
| **Management Support** | 63 | **6.2%** | 460 | **45.2%** | 263 | **25.8%** | 165 | **16.2%** | 58 | **5.7%** | 9 | **0.9%** | **1,018** |
| **Management (exempt)** | 14 | **0.7%** | 544 | **26.6%** | 759 | **37.1%** | 535 | **26.2%** | 178 | **8.7%** | 15 | **0.7%** | **2,045** |
| **Grand Total** | 3,068 | **22.3%** | 4,105 | **29.8%** | 2,719 | **19.7%** | 2,218 | **16.1%** | 1,310 | **9.5%** | 354 | **2.6%** | **13,774** |

(attached as **<u>Exhibit 8</u>**.) Also, like IKEA-101724-63, it concludes there is a lack of age diversity among those under 34 and under 25:

| **Our Potentials** |
|---|
| Retail Store Managers lack Diversity in all Areas -<br>Age - 64% are 45 or Older<br>Gender - 64% Male<br>Ethnicity - 85% White |
| Steering Group Managers by Function lack Diversity in all Areas -<br>Age - Only 16% <34<br>Gender - Not one function represents a 50% 50% split and most are skewed<br>Ethnicity - 75% White |
| Less tha 1% of Exempt Managers in the US are <25 |
| Exempt Management lack Ethnic Diversity at 67% White |
| IKEA's technology and current Total Rewards Strategy does not attract the desires of a Millennial workforce |
| Our Mobility position could deter workers with children from seeking advancement |

(*See* **<u>Exhibit 8</u>**; *see also* **<u>Group Exhibit 9</u>**.)

Plaintiffs had IKEA-026529 (attached as **<u>Exhibit 10</u>**), which in 2016 says essentially the same thing:




**59.8%** of our workforce is <34 up 2.9% from FY14
**51.9% of** our TL's & Mgmt. Support are<34
**28.7%** of our Exempt Mgrs. are <34

They also had IKEA-046992 (attached as **Exhibit 11**) which similarly states that millennials are underrepresented, and therefore, IKEA aspired to "spot and prioritize potential" among them and "move them faster through our development pipeline, increasing generational diversity on our leadership positions:"




Plaintiffs sought conditional certification in 2018 using documents reflecting the setting of a "KPI," key performance indicator, in "April 2014" of achieving the goal to have "31% of the managers 35 years old and younger." (ECF 47:10.)[3] Plaintiffs marshaled documents and testimony in 2018 to argue that HR personnel at IKEA believed younger employees were

[3] An unredacted copy of ECF 47 was provided at the time of filing.

underrepresented in management and set goals to improve that metric. (ECF 372-1:5 (¶¶ 2.4, 2.13, 2.14).) The Court in 2018 found the evidence Plaintiffs marshalled carried their "minimal burden" of so showing at that stage. (ECF 372-1:12 (¶ 2.16); ECF 70:6.)

Plaintiffs had every opportunity to, and did, depose high-level HR witnesses about this information:

- Olafsson testified that the IKEA "age-related" goals were to improve at identifying "high potentials" in the younger co-workers so as to get "younger people in the pipeline" to fill "gaps" in their representation in management positions. (Olafsson Dep., 94:19-97:1 (attached as **Exhibit 12**).)
- Ixtabalan testified that "age" was a "dimension of diversity" that IKEA tracked and sought to make "reflective of the communities in which we operated" and "our associate population." (Ixtabalan Dep., 100:2-10, 102:7-103:6 (attached as **Exhibit 13**).)
- Brody testified that "age" was a "dimension of diversity" that IKEA "measured," looked at to "see what the gaps are," and "set goals to bridge those gaps." (Brody Dep., 33:1-20 (attached as **Exhibit 14**).)
- Catherine Blair testified that IKEA HR "gathered the data and the facts," looked whether "in a location we had a gap" of "younger workers," and sought to "bridge the gap." (Blair Dep., 124:21-128:21 (attached as **Exhibit 15**).)
- Jacqueline DeChamps testified that IKEA HR tracked "demographics" to see where they "don't mirror a diverse work force" and sought a "well-rounded candidate pool so that you are ensuring that the demographic that you set as a goal for is actually included in the process." (DeChamps Dep., 82:1-84:1 (attached as **Exhibit 16**).) Where IKEA identified a gap in "young working professionals" it might post an opening at a "college's website or local university, in addition to the normal candidate postings that you have that are only reaching a certain demographic to expand access to a better candidate pool that will help you ensure an end-to-end process that is more diverse." (*Id.*, at 83:5-17.)

Plaintiffs also had every opportunity to, and did, depose store managers about this information, including Stein. Stein testified about "'Store Gaps and Goals'" including a "'[c]ommitment for SSG members under age 30,'" which he was "expected to put [] in place." (Stein Dep. 126:16-127:22 (attached as **Exhibit 17**).) It is not a revelation to Plaintiffs that, as

IKEA-101724-63 cumulatively reflects, store managers sometimes adopted age-related diversity goals.

Plainly it has been far from a secret that, as IKEA-101724-63 cumulatively reflects, high ranking HR professionals at IKEA tracked diversity metrics in connection with a goal to increase representation of younger people in management, among other dimensions of diversity. Plaintiffs' counsel channel Captain Renault in Casablanca when they feign "shock" to find that throughout the class period IKEA adopted "age-based personnel goals." (ECF 371:5 (¶ 5).) It is ironic that they bellicosely accuse IKEA of bad faith while they misrepresent what they knew to the Court.

**2.**

**Conditional Certification**
**(ECF 371:5 (¶ 6).)**

Contrary to Plaintiffs' assertion that they would have achieved conditional certification with unquantified "less effort," the supplemental production had not been ordered and, regardless, would not have simplified briefing.

First, in 2018 IKEA was under no order to conduct the global email search that yielded the email and slide deck Plaintiffs exclusively focus on. Plaintiffs and the Court were fully aware in 2018 that the parties had engaged in only limited pre-certification discovery that did not include the scale of merits discovery negotiated and ordered in 2022. The Court characterized pre-certification discovery as just an "initial round." (ECF 372-1:5 (¶ 2.3).) Plaintiffs' brief supporting conditional certification repeatedly emphasized that they had only "limited discovery taken to date," "limited discovery to date," "limited discovery," and "discovery on limited issues." (*Donofrio* ECF 35:1-3; ECF 372-1:8 (¶ 2.12).) It is disingenuous for Plaintiffs to pretend they thought IKEA had conducted a search in 2018 equivalent to the ESI Protocol negotiated and entered in 2022. (*See* ECF 372-1:13-17 (¶¶ 3.1-3.11).) Indeed, if Plaintiffs believed IKEA was

ordered to perform the equivalent of the ESI Protocol in 2018, then it would not have been necessary for them to negotiate for it in 2022. (ECF 372-1:16 (¶ 3.10).) It is even more disingenuous for Plaintiffs to pretend they thought that IKEA had in 2018 performed a global email search equivalent to the voluntary supplemental production in 2023. Axiomatically, a document that Plaintiffs would not have had anyway could not have lessened any effort by Plaintiffs in winning conditional certification.

Second, this slide deck would not have changed briefing on conditional certification one iota because the basis for the opposition was that individualized issues preclude collective treatment, not that IKEA did not have active diversity initiatives throughout the class period. IKEA opposed conditional certification on the grounds that liability hinges on "the particular circumstances of each application" and "individualized evidence for every putative class member." (*Donofrio* ECF 41:11.) Those individualized circumstances include, for example, whether each applicant was "qualified" and whether each applicant lost out to someone of "the same age or older." (*Donofrio* ECF 41:9-13.) IKEA argued that, even if "IKEA was engaged in a nationwide conspiracy to add younger employees to its management team across all of its stores," an "abstract policy of discrimination, without showing a connection to each class member—here, putative class members in 50 stores across the country—is insufficient."[4] (*Donofrio* ECF 41:13.)

Contrary to Plaintiffs' assertion, IKEA did not argue that no diversity initiatives were active after 2012. IKEA argued that one specific set of goals from 2012 had been retracted. These were the goals Plaintiffs excerpted on "the first page" of Plaintiffs' brief. (*Donofrio* ECF 41:16.) These goals were to have: (a) "1-2 high potential members" "under 25" on the "management team" as "successors" for Store Steering Group "by the end of 2012"; (b) "at least 1 member" on

[4] This would have been a wise inflection point for Plaintiffs' counsel to consider whether to continue to invest time and resources in a structurally doomed collective action.

SSG "under 30 by the end of 2013;" and (c) "at least one member" of the management team "under 35 by the end of 2015. (*Donofrio* ECF 35:1, 20.)[5] Both parties cited deposition testimony stating that these specific goals were retracted and not implemented. (*Donofrio* ECF 41:16; *Donofrio* ECF 47:17.) Both parties also addressed a host of later-dated diversity documents and initiatives. (*Donofrio* ECF 41:20-25; *Donofrio* ECF 47:19-27.) Plaintiffs used documents for every year from 2013 through 2018 reflecting age-related diversity goals and initiatives to argue that the 2012 goals had not been retracted. (*Donofrio* ECF 47:19-27; ECF 372-1:8 (¶ 2.13).) Those later-dated documents, of course, do not undermine the testimony that the 2012 goals were retracted. What they show is just that there were new and varied initiatives and goals across the class period. But the important point, for present purposes, is that IKEA did not argue that no diversity goals existed or survived retraction. IKEA argued the diversity goals were: (a) "too old or to limited in scope to suggest systemic discrimination that might affect the entire class and Plaintiff similarly;" and (b) not sufficiently "common throughout the class" period to be the "glue that binds the putative class together." (*Donofrio* ECF 41:4, 14-15.) In other words, "Plaintiffs' claimed mechanisms of systemic discrimination actually demonstrate dissimilarity." (*Donofrio* ECF 41:13.)

Conditional certification briefing would not have been obviated or simplified if Plaintiffs had one more document showing that in 2015 IKEA was tracking age diversity and sought to "increase the number of coworkers under 34 in exempt management" because "Millennials" account for "60% of our coworkers but only 20% of exempt managers." (IKEA-101724-63, at 48 (attached as **Exhibit 1**).) They knew that this tracking occurred and that there were goals to increase representation of people under 34 in management from a wealth of documents and testimony they already had. (ECF 372-1:8-11 (¶¶ 2.13, 2.14); *Donofrio* ECF 47:19-27).)

---

[5] An unredacted copy of ECF 35 was provided at the time of filing.

Ultimately, the Court agreed with Plaintiffs that documents and testimony they already had satisfied their light burden at the conditional certification stage of showing that IKEA: (a) "tracked the ages of its management personnel beginning in 2012 and continuing thereafter;" (b) through a "'succession planning' policy used "age" as "'one of the parameters' that IKEA looked at in considering who to promote;" (c) "used 'potential' ratings as a proxy for age-based assessments of promotability;" and (d) used "'learning agility'" ratings as a "discriminatory codeword" for age bias. (*Donofrio* ECF 70:7-8; ECF 372-1:8-11 (¶ 2.16).) One more cumulative document about tracking age "in the abstract" would not have precluded or changed the argument by IKEA that individualized issues preclude collective treatment. Plaintiffs would have had to file the same motion and brief. IKEA would have made the same arguments in opposition. Plaintiffs would have had to write the same reply. And the outcome would have been the same.

In sum, there is no basis for Plaintiffs' assertions that they should have had this document in 2018 or that it would have made any difference to conditional certification briefing.

**3.**

**Summary Judgment**
**(ECF 312:6 (¶ 8).)**

The motion for summary judgment IKEA filed on Donofrio's individual claim would not have been obviated by yet another document about diversity initiatives in the abstract because the motion was based on individualized issues. In fact, the motion was not predicated on the "retract[ion]" of diversity goals, as Plaintiffs claim. (ECF 371:6 (¶ 8).) Nor did it argue that the only "evidence otherwise" about diversity goals having been retracted were "'stray remarks' made in individual stores." (*Id.*) The motion did not question, and was entirely independent of, pattern and practice evidence. IKEA moved for summary judgment against Donofrio on the grounds that

the *specific* decision he challenged[6] was made without knowledge of Donofrio's age and solely based on Donofrio's lack of qualifications (and the successful candidate being most qualified). The decision maker, Sales Manager Elizabeth Spencer, who did not know Donofrio's age, selected him for an interview in which she concluded he lacked the necessary "qualifications" and even "competency." (*Donofrio* ECF 39:5-6; *Donofrio* ECF 39-2:5 (¶¶ 5, 28, 43, 45, 46).) The motion argued that "stray remarks" by Store Manager Camilla Meiby were not "direct evidence" because they were made two years prior and Meiby was not a decision maker. (*Donofrio* ECF 39:9-10.) As for the indirect theory, the motion was based on Donofrio's inability to show the legitimate explanation was "pretextual." (*Donofrio* ECF 39:12-18.) The motion had nothing to do with the existence or non-existence of diversity initiatives at IKEA. Plaintiffs' need to contort the arguments IKEA actually made belies that one more document about diversity in the abstract would not have foreclosed the motion for summary judgment.

**4.**

**2018 Motion for Sanctions**
**(ECF 312:5-6 (¶ 7).)**

Plaintiffs' failed 2018 sanctions motion was not necessitated by the lack of one more document reflecting age-related diversity initiatives or, in fact, necessitated at all. As shown above, IKEA was under no order to produce this document at that time and Plaintiffs already had documents the Court found sufficient to show company-wide diversity initiatives throughout the class period. (*See*, supra, § 2.) Plaintiffs can muster no explanation why having one more document reflecting the same thing would have: (a) prevented them in 2018 from filing a motion complaining that IKEA had produced some documents "*late;*" or (b) assuaged their suspicion that IKEA had not produced all documents "called for by the Court Order." (ECF 371:5 (¶ 7).) Plaintiffs would

[6] It also asserted that all other decisions Donofrio challenged were beyond the statute of limitations. (ECF 39:18-19.)

have filed the same motion.

**5.**

**Whether to Opt In/Out**
**(ECF 312:6 (¶ 9).)**

IKEA was under no order to produce the supplemental production in 2018, (*see*, supra, § 2), and Plaintiffs fail to show why having it would have attracted more opt-ins or stemmed the tide of withdrawals.

There is no substantial basis to believe anyone declined to opt in, or opted in and later withdrew, for lack of one (or more) additional cumulative document(s) pertaining to diversity initiatives. Plaintiffs' counsel had the Court's opinion that documents and testimony they already had sufficed to show at least preliminarily that IKEA: (a) "tracked the ages of its management personnel beginning in 2012 and continuing thereafter;" (b) through a "'succession planning' policy used "age" as "'one of the parameters' that IKEA looked at in considering who to promote;" (c) "used 'potential' ratings as a proxy for age-based assessments of promotability;" and (d) used "'learning agility'" ratings as a "discriminatory codeword" for age bias. (*Donofrio* ECF 70:7-8; ECF 372-1:8-11 (¶ 2.16).) As Plaintiffs' counsel concedes, the Court recognized the significance of its opinion in attracting opt-ins. (ECF 371:6 (¶ 9) ("opinion could be very helpful in their deciding whether to opt-in or not").) Plaintiffs' have no fact-based support for their contention that anything would have been changed by one more document reflecting, as the Court found, that IKEA "tracked" age and used it as "'one of the parameters' … in considering who to promote." (*Donofrio* ECF 70:7-8; ECF 372-1:8-11 (¶ 2.16).) It is implausible to speculate that anyone chose not to opt in, or withdrew,[7] for lack of more cumulative documents backing up the Court's opinion.

[7] The initial opt-ins who withdrew did so for wholly unrelated reasons. For example, Evan Ganz, Kari Julian, Nitra Mack, Stella Tenn, and William Wade were dismissed for failure to engage in written discovery. (*Antonelli* ECF 167:2-4; *Antonelli* ECF 189.) Thomas Blanchard, William Elrick, and Victoria James did not want to be deposed. (*Antonelli* ECF 258; *Paine* ECF 271; *Donofrio* ECF 331.) Barbara Rose opted in mistakenly. (*Paine* ECF 270.)

Plaintiffs unfairly blame IKEA for the fact that this litigation has "dragged on for years" without offering any evidence or analysis of how long such large and complex litigation usually takes or why IKEA is to blame for any alleged delay. (ECF 371:7 (¶ 9).) First, collective action litigation normally takes many years to litigate. Second, Plaintiffs themselves are responsible for much of the prolongation of the litigation they complaint about. For just one example, in March 2023 Plaintiffs sought an extension of discovery because of the departure of attorneys from their firm. (ECF 309 ("[i]n light of the departures of key attorney personnel, Plaintiffs need more time …").) Third, as IKEA has shown, IKEA did not violate any ordered deadline and the fact that the voluntary supplemental production was completed after the close of discovery is attributable at least as much to Plaintiffs' own strategic decisions. (ECF 372-1:68 (¶ 3.3), *Donofrio* ECF 75 (¶ 5.4).)

There is no basis for Plaintiffs' counsels' attempt to blame IKEA for their recruiting and retention results. Nor would it matter anyway since the cases must be decertified and severed.

**6.**

**Search Terms**
**(ECF 312:8 (¶ 12).)**

This slide deck would not have impacted the custodians or search terms in the ESI Protocol because there is no legitimate basis to suggest Plaintiffs should have had it prior to negotiating the ESI Protocol, and it introduces no new information.

First, again, there is no basis for Plaintiffs' premise that the supplemental production, or the particular documents they focus on, ought to have been produced in 2018. (*See* ECF 372-1:13-17 (¶¶ 3.1-3.11).) A document that Plaintiffs would not have had anyway could not have impacted their negotiation of search terms prior to entry of the ESI Protocol.

Second, this slide deck introduces no new information that would have impacted the ESI

Protocol:

- This slide deck did not introduce the term "HR Scorecard" to Plaintiffs. That phrase is in 54 documents produced before the supplemental production. (Gallor Mar. 11, 2024 Supp. Decl. ¶ 3(a) (attached as **Exhibit 41**).) For example:
  - IKEA 040743-70, at 63 (attached as **Exhibit 18**), reflects that an "HR Scorecard" is communicated on a "monthly" basis.
  - IKEA-016211-41, at 213 (attached as **Exhibit 19**), is a performance evaluation that reflects as one "quantitative measurement" the "HR Scorecard."

    Great Place to Work: Ensure we are fully staffed and have knowledgeable, engaged coworkers.
    Qualitative Measurements: Job skills training, 30/60/90 touch base, Development plans and PE check ins, open positions
    Quantitative Measurements: Recruiting statistics, IPulse, Turnover (HR Scorecard)

  - IKEA-041408-16, at 12 (attached as **Exhibit 20**), reflects:

    **Strategy #4**
    We will lead the retail industry in the US through ensuring the alignment and consistent application of IKEA's global approach to employment standards.

    **FY17 Tactics:**
    Anchor the understanding and awareness of IKEA's approach to employment standard amongst all managers.

    Establish a 2 year national and store by store plan to align with global employment standards with 100% compliance by FY19. (FY17-19)

    Establish a process to measure and monitor working condition and labor compliance. (FY17-19)

    Align leaders around new Global HR analytics Dashboard, update/adjust US HR Scorecard to provide a more robust picture of our people business. (FY 17/18)

    Establish a scheduling approach that aligns with global employment standards and is co-worker and customer centric. (FY17)

  - IKEA-035821-24, at 21 (attached as **Exhibit 21**), reflects:

    HR scorecard for under 90 day turnover (Annie has 3.9%, Sonja had 6.7%)

  There are 50 more. Plainly the search terms were adequate to find documents concerning the HR Scorecard. And if Plaintiffs honestly believed this phrase warranted running more search terms then they should have raised that in early 2023 and before plunging ahead with depositions. In any event, they knew about the HR Scorecard and had every opportunity to ask about it in any and all of the depositions. At least in some cases they did. (*See, e.g.*, Gorbeck Dep., 54:2-57:16 (attached as **Exhibit 22**) (in her role as "HR Business Navigation," Gorbeck "added" onto an existing "scorecard" that had "basic information at a very high level by store").)

- This slide deck does not introduce Stephani "Stevie" Lewis (formerly Conner). Ms. Lewis was mentioned in 47 documents prior to the December 2023 production. (Gallor Mar. 11, 2024 Supp. Decl. ¶ 3(b).) Ms. Lewis was previously identified as an individual with access to formal age-related complaints. (IKEA-012335 to IKEA-012357 (attached as **Exhibit 23**).) Not only was Ms. Lewis invited by Ixtabalan to the FY16 US D&I Meeting, (IKEA-012538-40 (attached as **Exhibit**

**24**)), but she was clearly involved in the planning of the FY16 US D&I Meeting. (IKEA-026480-81 ((attached as **Exhibit 25**).) Brody testified that Ms. Lewis was a "diversity ambassador" and what her responsibilities were in that role. (Brody Dep., 52:6-55:17, 88:22-89:9 (attached as **Exhibit 26**).) Moreover, Plaintiffs had indicated they intended to depose Ms. Lewis but then withdrew that request. (*See*, infra, § 8 (first bullet point).)

- Nor does it introduce Lars Petersson or other high level executives, or any new argument for their inclusion. Plaintiffs already sought to include Petersson and other high level executives. (*Donofrio* ECF 284:3-4.) Plaintiffs identify nothing newly revealed in this slide deck that would strengthen their bid to include Petersson or other high level executives. As IKEA has repeatedly shown, the "abstract" diversity documents and initiatives have been fully discovered and do not save these cases from decertification. More discovery up the chain, even further removed from the individualized promotion decisions, would not solve Plaintiffs' counsel's inescapable problem: liability cannot be determined collectively because it depends on each Plaintiff's unique, individual circumstances and each decision maker's unique, individual thoughts.
- Nor does this slide deck suggest a new reason for Plaintiffs to "participate[]" in the global email search. The obvious flaw in this argument is that their participation would have been of no value since IKEA voluntarily searched every mailbox. There is no one else for them to suggest including. And the search terms had already been negotiated. Moreover, Plaintiffs learned of this global search in June 2023 so, if they really had something to contribute, that was the time to speak up. Instead Plaintiffs ignored the global search and pressed on with depositions before it was completed. (ECF 372-1:26 (¶ 6.9), 68 (¶ 3.3 (collecting cases including but not limited to *Johnson v. Fulton Cnty. Bd. of Tax Assessors*, C.A. No. 1:18-cv-5292-TWT-JKL, 2021 WL 2582304, at *6 (N.D. Ga. Jan. 28, 2021) (party seeking sanctions may not complain of non-compliance or delay that "was as much his fault as anyone else").)

In sum, it is disingenuous for Plaintiffs to assert that this slide deck should have been produced before the ESI Protocol was entered or, if it had been, that it would have changed anything about it.

**7.**

**Discovery Focus**
**(ECF 312:7 (¶ 10).)**

Plaintiffs' already knew what they claim would have refocused their discovery:

- The HR Scorecard was well known to them. (*See*, supra, § 6.)
- The KPIs were well known to them:

- They sought conditional certification in 2018 using documents reflecting the setting of a "KPI," key performance indicator, in "April 2014" of achieving the goal to have "31% of the managers 35 years old and younger." (ECF 47:10.)[8]
- They showed Cathy Blair documents referring to age-related "KPIs" and questioned her at length about them. (Blair Dep., 301:4-303:21 (attached as **Exhibit 28**).)
- They showed Nabeela Ixtabalan documents referring to "tracking key diversity KPIs for years" and questioned her at length about them. (Ixtabalan Dep., 138:10-139:12, 184:1-187:8, 198:5-201:12 (attached as **Exhibit 29**).)
- They showed DeChamps documents referring to "tracking key diversity KPIs for years" and questioned her about it. (DeChamps Dep., 254:1-255:6, 295:20-296:23 (attached as **Exhibit 30**).)
- They showed Sari Brody documents referring the "age distribution KPI" and extensively questioned her about it. (Brody Dep., 213:20-219:12, 292:1-293:9 (attached as **Exhibit 31**).)

- The tracking and goal of improving representation of younger workers in management was exceedingly well known to Plaintiffs.
  - They marshaled documents and testimony in 2018 to argue that throughout the class period HR personnel at IKEA believed younger employees were underrepresented in management and sought to improve that metric. (ECF 372-1:5 (¶¶ 2.4, 2.13, 2.14).) The Court agreed in 2018. (ECF 372-1:12 (¶ 2.16).)
  - They deposed Olafsson, Ixtabalan, Brody, Blair and DeChamps, among others, about exactly this tracking and goal. (*See*, supra, p. 6-7.)

Plaintiffs' counsels' assertion that these things were news to them in 2023 is patently false.

**8.**

**Depositions**
**(ECF 312:8-9 (¶ 13).)**

As IKEA has shown, Plaintiffs' counsel chose to proceed with depositions, including those of Olafsson, Ixtabalan, Brody and Stein,[9] with full knowledge that IKEA was undertaking a global email search and supplemental production to remedy any perceived loss of needed evidence

---

[8] An unredacted copy of ECF 47 was provided at the time of filing.
[9] Plaintiffs baldly assert, without citation to transcripts, that unnamed deponents "could not recall specifics" or were "equivocal" in ways Plaintiffs do not describe. (ECF 371:9 (¶ 13).) Such "unsupported" and "undeveloped" arguments are waived. *Johnson v. Lutton*, 466 F. Supp. 3d 472, 476 (M.D. Pa. 2020).

resulting from the inadvertent deletion of a few mailboxes. (ECF 372-1:30 (¶ 7.7), 68 (¶ 3.3), 75 (¶ 5.4).) It was ***<u>Plaintiffs'</u>*** decision to do so, and to allow discovery to close, that has led to their wish to reopen depositions now. They cannot fob blame off on IKEA. (*Id.*, at 68 (¶ 3.3), 75 (¶ 5.4).)

The same is true of their assertion that they now wish to depose new people. They chose to allow discovery to close knowing they did not have the forthcoming supplemental production. Moreover, Plaintiffs were well aware of these people before the supplemental production:

- Stevie Lewis appeared in 47 different documents. (*See*, supra, at § 6.) Plaintiffs sought to depose her and explained the documents and testimony that led to their request:

  **From:** Susan Saint-Antoine <santanto@consolelaw.com>
  **Sent:** Monday, July 10, 2023 3:42 PM
  **To:** Sher, Brandon R. <brandon.sher@ogletreedeakins.com>; Cheryl Weaver <weaver@consolelaw.com>
  **Cc:** Caren Gurmankin <gurmankin@consolelaw.com>
  **Subject:** RE: IKEA - Deposition Scheduling (multiple deponents) [Olafsson, Custard, Lewis]

  ***[Caution: Email received from external source]***

  Good afternoon, Brandon. Ms. Lewis (formerly Conner) was an IKEA global D&I ambassador representing the United States. Her role per, e.g., IKEA-041261-IKEA-041281, was to "proactively develop the global D&I agenda and lead its implementation locally, integrating diversity & inclusion into all parts of the business, and enabling [IKEA's] unique and diverse co-workers to grow and develop." The global D&I agenda included, e.g., a commitment to "focus on young potentials". Rafael Fantzauzzi testified that Ms. Conner's role as a global D&I ambassador was not a legal position.
  Regards,
  Susan

  **Susan Saint-Antoine**
  **Partner, CONSOLE MATTIACCI LAW, LLC**

  t: 215.545.7676 | santanto@consolelaw.com
  Fax: 215.565.2858 | www.consolelaw.com
  1525 Locust Street, 9th Floor, Philadelphia, PA 19102

  CONSOLE MATTIACCI LAW

  Confidentiality Notice: The information contained in this email message is confidential and, if addressed to our client or certain counsel, is subject to the attorney-client privilege or work product privilege and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by email and delete the original message and all copies thereof. Thank you.
  Notice: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this e-mail, including attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service.

  (**<u>Exhibit 27</u>**.) Plaintiffs later withdrew the request. Their prior knowledge about her – which they do not even acknowledge let alone try to explain away – belies their empty assertion that they would have deposed her if they had the supplemental production.

- Kishorn Henry appeared in 142 documents, Gallor Mar. 11, 2024 Supp. Decl. ¶ 3(c), including on the invitation list to the FY16 US D&I Meeting from Ixtabalan, IKEA-012538 to IKEA-012540 (attached as **<u>Exhibit 24</u>**), and on the guest list for the meeting. (IKEA-024398 (attached as **<u>Exhibit 32</u>**).) Henry was also identified as a "D&I Market Coach" on the US D&I Council March 2016 Presentation. (IKEA-024473 to IKEA-024487 (attached as **<u>Exhibit 33</u>**).) Most importantly,

Henry was identified as holding the position of "Human Resources Conshohocken Store" – the exact store where Donofrio alleged he was discriminated against. (IKEA-026082 (attached as **Exhibit 34**).)

- Lauren Burinskas appeared in 47 documents, Gallor Mar. 11, 2024 Supp. Decl. ¶ 3(d), including on the invitation list to the FY16 US D&I Meeting from Ixtabalan, IKEA-012538 to IKEA-012540 (attached as **Exhibit 24**), and on the guest list for the meeting. (IKEA-024398 (attached as **Exhibit 32**).) Burinskas was also identified as a "Local D&I Ambassador" for the Frisco store. (IKEA-024458 (attached as **Exhibit 35**).) Burinskas was also identified as a "D&I Market Coach" on the US D&I Council March 2016 Presentation (IKEA-024473 to IKEA-024487 (attached as **Exhibit 33**).)
- Peter List appeared in 44 documents, Gallor Mar. 11, 2024 Supp. Decl. ¶ 3(e), including on an email chain stating he "understands the need with youth employment and to engage them in the workforce. Our future leaders!" (IKEA-041450 to IKEA-041452 (attached as **Exhibit 36**).) List was identified as a team member on the "Group People & Culture" Team with other known individuals, such as Sari Brody and managed by Ulrika Biesert. (IKEA-054806 to IKEA-054820 (attached as **Exhibit 37**).)
- Petra Hesser appeared in 35 documents, Gallor Mar. 11, 2024 Supp. Decl. ¶ 3(f), including as a recipient of Jacqueline DeChamps' FY14 D&I update, (IKEA-023588 to IKEA-023589 (attached as **Exhibit 38**), and a presenter at the FY14 D&I Workshop. (IKEA-032535 to IKEA-032561 (attached as **Exhibit 39**).)
- Ulrika Biesert appeared in 25 documents, Gallor Mar. 11, 2024 Supp. Decl. ¶ 3(g), including being identified in a FY14 IKEA Group HR Presentation as responsible, along with Sari Brody, for incorporating "diversity & inclusion" in IKEA's "Talent Roadmap" with the objective of developing a "diverse succession bench." (IKEA-035841 to IKEA-035890 (attached as **Exhibit 40**).)
- Lars Petersson is not new to Plaintiffs. (*See*, supra, at § 6.)

IKEA has never, and does not, oppose reopening discovery to allow Plaintiffs' to remedy their strategic error. IKEA, however, should not be expected to pay for Plaintiffs' strategic error. Moreover, the Court should not permit Plaintiffs to harass IKEA and the witnesses. For instance, Ixtabalan and Brody's depositions both lasted the entire seven-hour limit. Any additional time should be limited and the scope should be confined to the documents from the December 2023 supplemental production.

**9.**

**Coaching Plaintiffs**
**(ECF 312:9 (¶ 14).)**

Plaintiffs' counsel was not prejudiced by the unavailability of the December 2023 supplemental production to coach Opt-In Plaintiffs what to parrot back from documents about which they have no knowledge. There is no relevance to a plaintiffs' own opinions, characterizations of documents, and speculations about the subjective state of mind of others. *See*, *e.g.*, *Warren v. Tri Tech Laboratories*, 933 F. Supp. 2d 609, 612 (W.D. Va. 2014) (granting summary judgment to defendant because a plaintiff cannot create a fact issue with his "own statements" and "opinions," "own characterization of the various documents," or "speculative assertions regarding Defendant's 'state of mind' or 'motivation'"). All that matters are any "objective facts" they can offer "that might imply discrimination." *Mojica v. Advance Auto Parts*, No. 15-1418, 2016 WL 107844, at *3 (E.D. Pa. Jan. 11, 2016). Their "subjective conclusions as to other people's motivations or other matters is not valid evidence." *Id.*

No Opt-In Plaintiff could offer admissible testimony about documents they knew nothing about. Plaintiff after plaintiff testified to a complete lack of knowledge of similar diversity documents prior to their counsel showing them. Their testimony on those documents is inadmissible. Additional testimony about other documents they are also ignorant of would likewise be inadmissible.

Moreover, the supplemental production is entirely cumulative so the Opt-Ins had ample opportunity to point to similar documents in their depositions. And, even if there were anything marginally new in the supplemental productions, Plaintiffs cannot blame IKEA for prejudice they visited upon themselves by knowingly proceeding with depositions before receiving it. (ECF 372-1:30 (¶ 7.7), 68 (¶ 3.3), 75 (¶ 5.4).)

**10.**

**Experts**
**(ECF 312:9-10 (¶ 15).)**

It was not for lack of one more document about age-related diversity in the abstract that Plaintiffs chose to engage a statistician to try to make out a *prima facie* disparate impact case by showing that IKEA promotes younger workers more often than older workers. Such statistical evidence would not be obviated by evidence of any "company-wide policy", (ECF 371:9 (¶ 15)), that is reflected in the slide deck. This is apparent from the fact that Plaintiffs engaged this expert even though they had such evidence.

IKEA-101724-63 reflects what so many previously produced documents do and what so many witnesses testified to. It charts statistics showing millennials were underrepresented in management roles and concludes that "[w]e need to spot and prioritize potential and move them fast through our development pipeline" so as to "increase the number of coworkers under 34 in exempt management." This is entirely cumulative of a wealth of other documents and testimony. (*See*, supra, § 1.) It is telling that Plaintiffs dedicate just one sentence to the conclusory assertion that IKEA-101724-63 introduced to them, supposedly for the first time, a "company-wide" diversity initiative around age. (ECF 371:9 (¶ 15).) They do not even try, because it would only betray their disingenuity, to show how this document materially differs from the pile of documents and pages of testimony showing the same exact thing. (*See*, supra, § 1.)

The December 2023 supplemental production does not add material new information that would change the calculus of Plaintiffs' decision to hire a statistical expert. There is no good faith basis for Plaintiffs' specious assertion to the contrary.

## 11.

## 2023 Sanctions Motion
## (ECF 312:10 (¶ 16).)

Plaintiffs' present sanctions motion should be denied for all of the reasons IKEA explained in its post-hearing brief and proposed findings. (ECF 372, 372-1.) Plainly Plaintiffs should not be awarded fees for running up huge bills on both sides in a desperate effort to salvage their improvident investment in cases that are, and always have been, structurally unsuited to collective treatment.

## 12.

## Backup and
## Quantification of Damage

Even if Plaintiffs could show prejudice (which they plainly cannot), they have also failed to prove damages. They provide only gross dollar figures purportedly for entire litigation events. They do so even for events they claim would have been incrementally streamlined rather than avoided. They provide no supporting documents or detail.[10] If the Court is persuaded that sanctions are warranted for any event then IKEA is entitled to test these gross numbers first through discovery and then a continued hearing. It would be a violation of due process to award fees based on Plaintiffs' self-serving, unsupported and untested tallies.

Plaintiffs bear the burden of proving the requested fees were reasonably incurred, which includes at minimum showing that the "rates" are "reasonable" and the "number of hours reasonably expended." *See Miles v. Elliot*, No. 94-4669, 2011 WL 5524842, at *1 (E.D. Pa. Nov. 14, 2011) ("Party seeking fees pursuant to Rule 37 bears the burden of showing its request is reasonable" and the "lodestar formula, which multiplies by a reasonable hourly rate the number of

---

[10] In only one instance do Plaintiffs identify how many hours are associated with one of the gross dollar figures, and this instance reveals they seek an astonishing average hourly rate of $884.21. (ECF 371:8 (¶ 13.A).)

hours reasonably expended, provides the starting point for determining reasonable attorneys' fees."). "The Court has an independent duty to satisfy itself that the [ ] fees requested are reasonable." *Id.* (citing *Alphonso v. Pitney Bowes, Inc.*, 356 F. Supp. 2d 442, 460 (D.N.J. 2005)) (internal quotation marks omitted). IKEA has as much due process right to contest the amount of any sanction as it does its imposition. *Ocelot v. Sparrow Indus.*, 847 F.2d 1458, 1465-66 (10th Cir. 1988) (sanctions respondents' due process rights include not just the opportunity to contest the "propriety and type of sanctions to be awarded" but also the "amount of fees to be awarded"). IKEA cannot exercise its right without discovery adequate to effectively contest the claimed amount at an evidentiary hearing.

The discovery IKEA is entitled to includes, for each event Plaintiffs claim would have been avoided or in whole or in part, at least the following:

(a) Plaintiffs' full billing records with detailed time entries for each time keeper with the billing rates, and details on all claimed expenses;

(b) Precise breakdowns by event of the billing entries and expenses that purportedly would have been avoided;

(c) Production of all drafts and final documents that supposedly would have been unnecessary or different;

(d) Production of all internal emails strategizing about the events and documents Plaintiffs claim would have been affected; and

(e) Depositions of all relevant timekeepers. This includes at least Laura Mattiacci and Susan Saint-Antoine. After review of the time records IKEA likely will also identify additional deponents who worked the cases including from the pool of departed attorneys and current attorneys.

Then, after IKEA is afforded such discovery and a chance to marshal its defense (which probably will include experts), the evidentiary hearing should be resumed.

The problem of quantification of prejudice should be unnecessary since Plaintiffs' fail to show sanctionable conduct or show prejudice even qualitatively. If, however, the Court believes

they have shown sanctionable conduct and prejudice then IKEA must be afforded discovery and an opportunity to defend itself.

March 11, 2024

Respectfully submitted,

IKEA HOLDING US, INC., IKEA US RETAIL LLC, and IKEA NORTH AMERCIA SERVICES, LLC

*By:/s/ Thomas A. Lidbury*

Paul Lancaster Adams, Esq.
Brandon R. Sher, Esq.
Jennifer G. Betts, Esq.
Emily Santoro, Esq.
Chris R. Pace, Esq. (Admitted *Pro Hac Vice*)
John G. Stretton, Esq. (Admitted *Pro Hac Vice*)
Thomas A. Lidbury, Esq. (Admitted *Pro Hac Vice*)
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, PC.**
1735 Market Street, Suite 3000
Philadelphia, PA 19103
(215) 995-2800 Telephone

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 11 day of March, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court and are available for viewing and downloading from the ECF system.

*/s/ Thomas A. Lidbury*
Thomas A. Lidbury